UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE LIU, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | Case No. 24-cv-07400-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 32 |

Pending before the Court is Defendant Bank of America, N.A.'s motion to dismiss the complaint or, alternatively, motion to stay the case pending alternative dispute resolution. Dkt. No. 32. For the following reasons, the Court **GRANTS** the motion to dismiss.

**I.   BACKGROUND**

Plaintiffs Lawrence Liu and Ling-Ling Liu were victims of a fraudulent scheme in which an unidentified scammer took approximately $18 million of their savings. *See generally* Dkt. No. 1 ("Compl."). Plaintiffs were deceived into believing that their Charles Schwab investment accounts had been compromised. *See id.* at ¶¶ 44–55. Beginning in July 2024, the scammer posed as a Charles Schwab representative and told Plaintiffs that they had to transfer their assets to "external sources" to safeguard them. *See id.* at ¶¶ 53–55. The scammer had accurate and detailed knowledge of Plaintiffs' accounts and sent Plaintiffs multiple letters purporting to be from the IRS, Social Security Administration, and Charles Schwab's Fraud Prevention Department. *See id.* at ¶¶ 47–49, 56–57, 90–93, 144–45, 153–55, 179–80. The letters reiterated that Plaintiffs' Charles Schwab accounts had been compromised and that Plaintiffs needed to liquidate their stock holdings and move their assets to other accounts. *Id.* In addition to following the scammer's instructions, Mr. Liu also granted the scammer remote access to his home computer. *See id.* at

1  ¶¶ 56–57.

2       The scammer linked Plaintiffs' Charles Schwab accounts to several of Plaintiffs' other
3 bank accounts, including one at Bank of America. *See id.* at ¶¶ 58, 76, 79, 94. The scammer also
4 convinced Plaintiffs to open an account with Unchained Trading, LLC, a cryptocurrency
5 exchange. *See id.* at ¶¶ 66–71. The scammer then linked Plaintiffs' bank accounts with their new
6 Unchained account. *See id.* at ¶¶ 75, 94. From July to September 2024, the scammer—either
7 directly or through Mr. Liu—liquidated Plaintiffs' stock holdings at Charles Schwab, transferred
8 funds to Plaintiffs' bank accounts via MoneyLink (an Automated Clearing House) or wire
9 transfers, and then transferred funds from the bank accounts to Plaintiffs' Unchained account via
10 wire transfer. *See, e.g.*, *id.* at ¶¶ 63, 73, 77–89, 94–97, 99–100, 107–08, 110–15, 137–39, 147–50,
11 156–58, 165–67, 170–75, 181–85, 188–90, 198–99. The scammer then used the funds in the
12 Unchained account to purchase cryptocurrency and swiftly withdrew the cryptocurrency from the
13 account. *See id.* at ¶¶ 117–18, 142–43, 151–52, 163–64, 168–69, 177–78, 186–87, 200.

14       As relevant here, Plaintiffs allege that Mr. Liu physically walked into Bank of America
15 branch offices on nine different occasions from July 23, 2024, to September 13, 2024, and
16 requested large wire transfers from his Bank of America account to his Unchained account. *See*
17 *id.* at ¶¶ 110, 113–15, 126–28, 137–39, 147–50, 156–58, 165–67, 172–74, 183–85, 188–90, 198.
18 Each time, Mr. Liu met with Bank of America bankers and explained that he was having security
19 issues with his Charles Schwab account and needed to move assets to protect them. *See id.* at
20 ¶¶ 113–14,127–28, 138, 148, 157, 166, 173, 184, 189. Mr. Liu requested seven of these transfers
21 at the same branch location. *See id.* at ¶¶ 137–39, 147–50, 156–58, 165–67, 172–74, 183–85,
22 188–90. But only once did Bank of America representatives refuse to process the wire transfer.
23 *See id.* at ¶¶ 126–29. Plaintiffs allege that in the span of two months they transferred
24 approximately $22 million into—and out of—their Bank of America account. *See id.* at ¶¶ 198–
25 99. On September 16, 2024, the FBI intervened and provided notice to Plaintiffs, the banks, and
26 Unchained that Plaintiffs had been the victims of a fraudulent scheme. *See id.* at ¶ 192.

27       Based on these allegations, Plaintiffs initially filed a complaint against The Charles
28 Schwab Corporation; Charles Schwab Bank, SSB; Bank of America, N.A., and Unchained

Trading, LLC. *See id.* However, Plaintiffs voluntarily dismissed the claims against The Charles Schwab Corporation; Charles Schwab Bank; and Unchained without prejudice. *See* Dkt. Nos. 20, 25. Plaintiffs appear to acknowledge that they are currently arbitrating those claims. *See* Dkt. No. 38 at 24. Bank of America, therefore, is the only remaining Defendant in the case.[1] Plaintiffs bring claims against Bank of America for (1) violations of the California Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA"), Cal. Welf. & Inst. Code §§ 15600 *et seq.*; (2) violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (3) gross negligence. *See* Compl. at ¶¶ 240–82. Defendant Bank of America moves to dismiss the complaint. *See* Dkt. No. 32.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 9(b) imposes a heightened pleading standard where fraud is an essential element of a claim. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). A plaintiff must identify "the who, what, when, where, and how" of the alleged conduct, so as to provide defendants with sufficient information to defend against the charge. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). However, "[m]alice, intent,

---

[1] Unless otherwise indicated, the term "Defendant" in this order thus refers to Bank of America.

knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. Rule 9(b).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

**III.   DISCUSSION**

   **A.   California Uniform Commercial Code**

As an initial matter, Defendant argues that Plaintiff's claims are all displaced by Division 11 of the California Uniform Commercial Code, which regulates "funds transfers."[2] *See* Dkt. No. 32 at 5–9; *see also* Cal. Com. Code §§ 11101 *et seq.*; *Zengen*, 41 Cal. 4th at 244–47. Plaintiff does not appear to dispute that the wire transfers at issue here are "funds transfers" under Division 11. *See* Dkt. No. 9–11. Defendant urges that Division 11 reflects a policy choice about the allocation of risk for funds transfers like the wire transfers at issue here, and it thus provides the exclusive rights, duties, and liabilities of the parties. *See* Dkt. No. 32 at 5–6. Defendant contends that Plaintiffs' claims attempt to circumvent these policy decisions by imposing liability on banks for processing otherwise authorized transfers where the authorizations were fraudulently induced by third parties. *Id.*

The California Supreme Court has held that given its detailed regulatory structure, Division 11 displaces or "preempts" common law causes of action involving funds transfers in two specific circumstances:

> (1) where the common law claims would create rights, duties, or liabilities inconsistent with division 11; and (2) where the circumstances giving rise to the common law claims are specifically

---

[2] In 1990, the California Legislature enacted Article 4A of the Uniform Commercial Code ("UCC") as Division 11 of the California Uniform Commercial Code. *See Zengen, Inc. v. Comerica Bank*, 41 Cal. 4th 239, 244 (Cal. 2007).

4

covered by the provisions of division 11.

*Zengen*, 41 Cal. 4th at 253 (quotation omitted).[3]  Defendant appears to suggest that both circumstances exist here because Division 11 explains when funds transfers are considered "authorized," and when banks must refund payments. *See* Dkt. No. 32 at 6–9.

Under Division 11, a "funds transfer" is defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order." Cal. Com. Code § 11104(a). A "payment order," in turn, "means an instruction of a sender to a receiving bank, transmitted orally or in a record, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary . . . ."[4] Cal. Com. Code § 11103(a)(1). Division 11 also identifies when a payment order is considered "authorized":

> A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency.

Cal. Com. Code § 11202(a). Likewise, Division 11 outlines a bank's duty in refunding unauthorized payment orders. A receiving bank that has accepted "a payment order issued in the name of its customer as sender" must "refund" that payment if it was "not authorized and not effective as the order of the customer . . . ." Cal. Com. Code § 11204(a)(i); *see also* Cal. Com. Code § 11212 (limiting liability of receiving bank for accepting payment orders to that provided in the UCC).

In *Zengen*, the plaintiff's chief financial officer forged signatures on funds transfers in the amount of $4.6 million from the plaintiff company's account to an account that he solely controlled. *See id.* at 243. The plaintiff sued the bank that processed the transfers. *Id.* at 244–46. The court noted that "[t]he ultimate question in this litigation is who must bear the loss: the bank

---

[3] The Court notes that Division 11 does not apply to funds transfers governed by the Electronic Fund Transfer Act of 1978. *Zengen*, 41 Cal.4th at 248, n.6. Although Plaintiffs alleged that the transfers originating from Plaintiffs' Unchained Trading, Inc. account are unauthorized transfers under the EFTA, there is no such allegation that the fund transfers involving Defendant Bank of America are governed by the EFTA. *See* Compl. at ¶¶ 293, 297, 304.
[4] Here, Mr. Liu was the sender, Bank of America was the receiving bank, and the account at Unchained was the beneficiary.

5

that honored the fraudulent payment orders or the company that employed the embezzler." *Id.* at 243. Despite the acknowledged fraud, the California Supreme Court held that the plaintiff's causes of action for breach of contract, negligence, return of deposit, and money had and received were all displaced by Division 11. *See id.* at 251–55. The court explained that "the gravamen of each of [the plaintiff's] causes of action against the Bank, including the one based on the California Uniform Commercial Code, is the same: The Bank should not have accepted and executed the fraudulent payment orders." *Id.* at 254. Although the plaintiff alleged circumstances that should have alerted the bank to the suspicious nature of the transfers, the court still found that Division 11 "sets forth the respective rights, duties and liabilities of the parties upon the issuance and acceptance of a payment order" such that the plaintiff's exclusive remedy was under the California Uniform Commercial Code. *Id.* at 254–55.

Here too, Defendant argues that Plaintiffs' exclusive remedy is under the California Uniform Commercial Code. *See* Dkt. No. 32 at 5–9. But Plaintiffs do not raise any causes of action under Division 11, nor is it likely that they could. Plaintiffs' own allegations confirm that Mr. Liu authorized the wire transfers in person, directing Bank of America to transfer money from his account at Bank of America to his account at Unchained. *See, e.g.*, ¶¶ 110, 113–15, 137–39. Under Plaintiffs' theory of liability, the bank should have rejected the account owner's authorized request to move his own money between his own accounts and now should be required to refund such authorized transfers. Division 11 does not require this, and as explained above, specifically defines "authorized" payment orders and limits the circumstances in which banks must provide refunds. *Cf. Harborview Cap. Partners, LLC v. Cross River Bank*, 600 F. Supp. 3d 485, 491–95 (D.N.J. 2022) (finding transfers authorized for purposes of UCC and granting motion to dismiss even where victim had been tricked by third-party fraudster into making the transfer) (collecting cases).

Plaintiffs nevertheless respond that Division 11 does not displace their claims because it cannot displace (1) causes of action based on conduct that occurred before or after the wire transfers; or (2) statutory claims. *See* Dkt. No. 38 at 9–11.

//

### i. Scope of Plaintiffs' Claims

Plaintiffs point out that in *Zengen*, the California Supreme Court stated that "[t]he California Uniform Commercial Code does not automatically displace all other legal principles." *Zengen*, 41 Cal.4th at 251. Plaintiffs urge that Defendant therefore cannot escape liability for alleged misconduct that occurred *before* or *after* the wire transfers. *See* Dkt. No. 38 at 10–11. Plaintiffs assert in conclusory fashion that "the Complaint includes numerous allegations" about alleged misconduct that is distinct from the wire transfers. *See id.* at 10, & n.47; *cf. Across Am. Ins. Servs., Inc. v. Bank of Am., N.A.*, No. SACV180874DOCPLAX, 2018 WL 5906674, at *3–4 (C.D. Cal. Sept. 24, 2018) (finding that negligence claim was not displaced where it was based on pre-transfer conduct such as failing to warn of risks involved in wire transfers approved by phone).

However, even assuming that Plaintiffs have alleged some misconduct that arguably occurred before the wire transfers, Plaintiffs' alleged damages all turn on the fact that Defendant processed the transfers. *See, e.g.*, Compl. at ¶¶ 115, 139, 150, 158, 167, 199. For example, in support of their UCL claim, Plaintiffs allege that Defendant failed to protect Plaintiffs from financial elder abuse "by failing to follow their own fraud monitoring, prevention and protection policies . . . ." *See id.* at ¶ 259. But the harm that Plaintiffs allege they suffered resulted from "transferring millions of dollars of Plaintiffs' funds via wire transfers . . . ." *See id.* And as already discussed above, Division 11 squarely covers the processing of wire transfers.

### ii. Application to Statutory Claims

Even if Division 11 displaces their gross negligence claim, Plaintiffs argue that it does not displace their other statutory causes of action under the EADACPA and UCL.[5] *See* Dkt. No. 38 at 9–10. Plaintiffs point out that the California Supreme Court in *Zengen* specifically held that Division 11 displaced the plaintiff's "common law" causes of action. *Id.*; *see also Zengen*, 41 Cal. 4th at 253 ("[W]e agree with the Court of Appeal that division 11 provides that *common law causes of action* based on allegedly unauthorized funds transfers are preempted . . . .") (emphasis

---

[5] The Court notes that Plaintiffs and Defendant only address this argument in passing. Plaintiffs provide no authority suggesting that Division 11 can only displace common law claims, and Defendant offers only a passing discussion of this issue in reply. *See* Dkt. No. 38 at 9–10; Dkt. No. 40 at 3. This is inadequate.

added) (quotation omitted). The only claims in *Zengen*, however, were common law claims. The court thus did not have occasion to consider directly whether Division 11 could likewise displace statutory claims. The court nevertheless framed the legal question before it broadly as "whether the California Code has fully occupied the field of this litigation and displaced the non California Code causes of action" and whether "other principles of law will apply" outside the UCC. *See Zengen*, 41 Cal. 4th at 251.

The court's reasoning in *Zengen* would seem to apply equally to common law and statutory claims. The court discussed at length the history of Article 4A to the UCC and California's adoption of it in Division 11. *See id.* at 251–53. In doing so, the court highlighted Code Comments to the UCC that it found persuasive in interpreting Division 11:

> A deliberate decision was [] made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately.
>
> . . .
>
> Funds transfers involve competing interests—those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. *The rules* that emerged represent a careful and delicate balancing of those interests and are *intended to be the exclusive means* of determining the rights, duties and liabilities of the affected parties *in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.*"

*Id.* at 252 (citing Cod. Com., Unif. Commercial Code § 4A-102) (emphasis in original). This underlying need for uniformity and predictability compels the conclusion that Division 11 displaces both common law and statutory claims. Division 11 could not be "the exclusive means of determining the rights, duties and liabilities of the affected parties" with respect to funds transfers if another statute imposed competing obligations. *Id.*

8

Plaintiffs do not grapple with this language or the *Zengen* court's substantive reasoning at all. *See* Dkt. No. 38 at 9–10. And the Court does not find Plaintiffs' conclusory opposition persuasive on this point. The Court finds that all Plaintiffs' claims are displaced by Division 11, and the motion to dismiss is **GRANTED** on this basis. For the sake of completeness, and to the extent Plaintiffs intend to amend the complaint, the Court briefly addresses the substance of Plaintiffs' claims below.

### B.  EADACPA

Plaintiffs allege that Defendant's conduct "assisted" the scammer in taking millions of dollars of Plaintiffs' savings, in violation of the EADACPA, by processing the wire transfers from Plaintiffs' Bank of America accounts to their Unchained account. *See* Compl. at ¶¶ 240–56. As relevant here, § 15610.30(a) states that "financial abuse of an elder" occurs when a person or entity "[a]ssists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." Cal. Welf. & Inst. Code § 15610.30(a)(2). Courts have interpreted the term "assist" in this context to require that the defendant had "actual knowledge of the underlying wrong it purportedly aided and abetted." *See, e.g.*, *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 744–45 (Cal. Ct. App. 2010) (quotation omitted).

Here, Plaintiffs contend that Defendant "had actual knowledge that Plaintiffs were the victims of a fraud perpetrated by the non-party recipient of Plaintiffs' wire transfers." *See* Compl. at ¶¶ 232, 236, 243–44, 246. Specifically, Plaintiffs contend that Defendant had actual knowledge of the fraud because (1) historically Plaintiffs had only engaged in minimal banking activities at Bank of America, so the influx in funds was anomalous; (2) Mr. Liu requested seven of the eight wire transfers at the same Bank of America branch within a short period of time; and (3) during one of Mr. Liu's visits at another branch, a banker had refused to process the wire transfer. *See id.* at ¶ 246. But even accepting these allegations as true and drawing all reasonable inferences in Plaintiffs' favor, as the Court must at this stage, these allegations are insufficient to plead that Defendant had actual knowledge of the fraud. At best, they suggest that Defendant should have had suspicions that Mr. Liu was a possible fraud victim.

9

Although the transactions may have been unusual for Plaintiffs, according to the complaint, Mr. Liu offered a brief explanation for his actions: he told branch employees that his accounts at Charles Schwab had been compromised so he was moving funds to his other accounts. *See* Compl. at ¶¶ 113–14,127–28, 138, 148, 157, 166, 173, 184, 189. And unlike in *Lin v. JPMorgan Chase Bank, N.A.*, No. 2:24-CV-01837-JLS-E, 2024 WL 5182199 (C.D. Cal. Aug. 15, 2024), a case which Plaintiffs rely on heavily, Mr. Liu was requesting to transfer funds between his own accounts. In *Lin*, the elderly plaintiff wired money from her Chase bank account to a "fake account" on a "fake application" for a fake investment opportunity with a scammer. *See id.* at *1. But here, in contrast, the Unchained account was in Mr. Liu's name, even if opened at the direction of a scammer. *See id.* at ¶ 68 ("[A]n account was created for Mr. Liu at Unchained."); ¶ 71 ("Unchained approved Mr. Liu's account."); ¶¶ 143, 152, 164, 169, 178, 187 (alleging "the newly-purchased . . . cryptocurrency was withdrawn from Mr. Liu's unchained account" and sent to an address "believed to be maintained by the [scammer]"). There are no allegations supporting the inference that the bank knew a third party had access to Mr. Liu's Unchained account such that his money was unsafe there or that these transfers were part of some larger fraud scheme.

### C. Gross Negligence

Plaintiffs next allege that Defendant was grossly negligent in failing to exercise reasonable care in securing Plaintiffs' accounts. *See* Compl. at ¶¶ 265–82. Plaintiffs contend that Defendant "had a special relationship with Plaintiffs" and knew it was "the gatekeeper[] for Plaintiffs' accounts and valuable assets." *See id.* at ¶¶ 269–70.

As an initial matter, Defendant argues that California does not recognize a distinct claim for "gross negligence" as opposed to simple negligence. *See* Dkt. No. 32 at 12–13. This issue appears to be somewhat unsettled. Several cases have broadly stated that "California does not recognize a distinct cause of action for 'gross negligence' independent of a statutory basis." *See, e.g.*, *Grappo v. McMills*, 11 Cal. App. 5th 996, 1014 (Cal. Ct. App. 2017) (quotation omitted). However, the California Supreme Court, although recognizing these cases, has not definitively weighed in. *See City of Santa Barbara v. Superior Ct.*, 41 Cal. 4th 747, 778–81, & n.59 (Cal. 2007). In any event, Plaintiffs respond that even assuming gross negligence is not a separate

10

cause of action, they have still pled a claim for simple negligence.  *See* Dkt. No. 38 at 21–23.

"The elements of a negligence cause of action are the existence of a legal duty of care, breach of that duty, and proximate cause resulting in injury."  *Castellon v. U.S. Bancorp*, 220 Cal. App. 4th 994, 998 (Cal. Ct. App. 2013).  "The existence of a duty of care owed by a defendant to a plaintiff is a prerequisite to establishing a claim for negligence."  *Nymark v. Heart Fed. Sav. & Loan Assn.*, 231 Cal. App. 3d 1089, 1095 (Cal. Ct. App. 1991).  "[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money."  *Id.* at 1096.  And similarly, "banks are not fiduciaries for their depositors," and instead their relationship is "founded on contract."  *See Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 537 (Cal. Ct. App. 1998) (quotation omitted).

Plaintiffs recognize this.  *See* Dkt. No. 38 at 22 ("[B]anks typically are not burdened with a duty of care to protect accountholders [from] fraud inflicted upon them that flows through their bank accounts . . . .").  Nevertheless, Plaintiffs contend that this case falls under an exception to the general rule.  *See id.* at 22–23 (citing *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal. 3d 671 (Cal. 1978)).  Plaintiffs broadly assert that banks still "'have a duty to make reasonable inquiries' when 'the circumstances alleged' are 'sufficiently suspicious' and the risks are 'sufficiently apparent.'"  *Id.* (quoting *Sun 'n Sand*, 21 Cal. 3d at 693).

In *Sun 'n Sand*, one of the plaintiff's employees embezzled thousands of dollars from the company by manipulating company checks.  *See Sun 'n Sand*, 21 Cal. 3d at 678–79.  The employee obtained authorized signatures from a company officer on several checks, each in different but small amounts, and each made payable to the defendant bank.  *See id.*  The employee then altered these checks by increasing the amount of each by several thousand dollars.  *Id.*  Although the defendant bank—and not the employee—was listed as the payee, the employee presented the checks to the defendant bank to deposit in the employee's personal account and the bank did so.  *See id.*  As relevant here, the plaintiff company brought a negligence claim against the bank for breaching its duty of care in depositing the checks into the employee's account when the bank was named as the payee.  *See id.* at 692–93.

11

The California Supreme Court considered several factors in determining whether the bank should owe the plaintiff company a duty of care under such circumstances, including the foreseeability of the loss. *See id.* at 695–96. In finding a duty of care, the court was careful to note that the duty was "narrowly circumscribed: it is activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." *Id.* at 695. The court further held that even in such circumstances, "the bank's obligation is minimal" in that it "[t]here must be objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed." *Id.* at 695–96.

The facts alleged here, however, are nothing like those in *Sun 'n Sand*. This case involved wire transfers, not checks, and unlike the embezzler in *Sun 'n Sand*, Mr. Liu was authorized to transfer funds from his account at Bank of America to his account at Unchained. There were thus "objective indicia from which the bank could reasonably conclude" that Mr. Liu was "authorized to transact in the manner proposed." *See id.* Plaintiffs seek, in effect, to create a new duty of care for banks to protect accountholders from their own choices. Even though Mr. Liu had authority to request the funds transfers, Plaintiffs allege that the bank should have intervened to protect him from the risk of third-party fraud. But nothing in *Sun 'n Sand* creates such a sweeping duty, and Plaintiffs offer no explanation why such an extension of *Sun 'n Sand* is appropriate here.[6] *Cf. Kurtz-Ahlers, LLC v. Bank of Am., N.A.*, 48 Cal. App. 5th 952, 956–58 (Cal. Ct. App. 2020) (declining to extend *Sun 'n Sand* to create new duty for bank to inquire into possible fraud where third party deposited checks payable to her).

Defendant also argues that Plaintiffs' negligence claim is barred by the economic loss rule. *See* Dkt. No. 32 at 14. "The economic loss rule requires a [party] to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *See Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th

---

[6] Plaintiffs suggest in passing that Defendant may be held liable for failing to "discharge its contractual duties with reasonable care." *See* Dkt. No. 38 at 22 (citing *Das*, 186 Cal. App. 4th at 741). But Plaintiffs do not explain what contractual duties may be implicated here.

12

979, 988 (Cal. 2004). Plaintiffs appear to concede that the economic loss rule applies, but suggest that they have suffered non-economic losses. *See* Dkt. No. 38 at 23, & n.88. Plaintiffs cite to a few broad allegations in the complaint that "[f]inancial elder abuse causes irreparable harm to its elderly victims," and "[m]any victims suffer even more from feelings of betrayal . . . ." *See id.* (citing Compl. at ¶ 233). But the complaint does not allege that *Plaintiffs* suffered any specific non-economic losses.

### D.  UCL

Lastly, Plaintiffs allege that Defendant's conduct violated the UCL. *See* Compl. at ¶¶ 257–64. Defendant raises several procedural problems and substantive deficiencies with this claim. *See* Dkt. No. 32 at 18–21.

#### i.  Equitable Relief

"In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus.*, 49 F.4th 1308, 1313 (9th Cir. 2022). Defendant points out that Plaintiffs have not pled that they lack an adequate legal remedy, and are seeking the same money in restitution that they seek in damages. *See* Dkt. No. 32 at 18–19. Plaintiffs do not suggest that they have pled that they lack an adequate legal remedy, which (however easy to remedy) precludes them from seeking equitable relief. *See Ramos v. Gap, Inc.*, No. 23-CV-04715-HSG, 2024 WL 4351868, at *6 (N.D. Cal. Sept. 30, 2024). Moreover, although Plaintiffs suggest that their UCL theory is distinct from their EADACPA claim, they offer no explanation as to how. *See* Dkt. No. 38 at 18–19. Plaintiffs' bald assertion that they are different is insufficient.

#### ii.  Substantive Claim

Setting aside these procedural deficiencies, Defendant argues that Plaintiffs' UCL claim should be dismissed because they also have not pled any actionable unlawful, unfair, or fraudulent conduct. *See* Dkt. No. 32 at 19–21. But once again, Plaintiffs provide only a cursory response to these arguments. *See* Dkt. No. 38 at 20–21. Plaintiffs appear to rely solely on the argument that Defendant's conduct was "unfair." *See id.* They urge the Court to apply the test for unfair

13

conduct expressed in *Camacho v. Auto. Club of S. California*, for consumer cases, which requires:

> (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided

142 Cal. App. 4th 1394, 1403 (Cal. Ct. App. 2006). Plaintiffs' own authority, however, recognizes that there is a "split of authority" as to whether this test applies. *See Lin*, 2024 WL 5182199, at *10. *But see Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735–36 (9th Cir. 2007) (applying either "balancing" or "tethering" test in consumer context).

But even assuming the *Camacho* test applies, Plaintiffs only claim that they were elderly victims of a third-party fraud scheme, and could not have avoided the financial losses themselves. They do not allege what specific business practice or policy violated the UCL. Nor have they alleged any facts about the relative utility of Defendant's practices. As Defendant points out, there may be public policy considerations that outweigh the risks here, such as the efficient processing of banking transactions that are authorized by customers. The Court is sympathetic that Plaintiffs lost an enormous amount of their savings at the hands of a third-party fraudster. But without more, the Court cannot find that Plaintiffs have adequately pled their UCL claim against Defendant.

## IV. CONCLUSION

The Court **GRANTS** the motion to dismiss. Dkt. No. 32. The Court is skeptical, given the deficiencies identified above, that Plaintiffs could amend their complaint to survive a subsequent motion to dismiss. Still, at this stage in the litigation, the Court cannot say that amendment necessarily would be futile. Plaintiffs may therefore file an amended complaint within 21 days of the date of this order. Plaintiffs are cautioned, however, that they should fully plead their best case in any amended complaint as the Court is unlikely to grant further leave to amend.

//

//

//

The Court anticipates that Defendant will file a motion to dismiss any amended complaint. The Court will therefore wait to set a case schedule until after Plaintiffs have filed their amended complaint and Defendant has responded.

**IT IS SO ORDERED.**

Dated: 9/18/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

15