UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAWRENCE LIU, et al.,

Plaintiffs,

v.

BANK OF AMERICA, N.A.,

Defendant.

Case No. 24-cv-07400-HSG

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 46

Pending before the Court is Defendant Bank of America, N.A.'s motion to dismiss. Dkt. No. 46. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons detailed below, the Court **GRANTS** the motion.

## I. BACKGROUND

The parties are familiar with the facts of this case, so the Court only details them here as relevant to the pending motion. Plaintiffs Lawrence Liu and Ling-Ling Liu initially filed this action against Defendant for (1) violations of the California Elder Abuse and Dependent Adult Civil Protection Act ("EADACPA"), Cal. Welf. & Inst. Code §§ 15600 *et seq.*; (2) violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (3) gross negligence. Dkt. No. 1. The Court granted Defendant's motion to dismiss, but granted Plaintiffs leave to amend. *See* Dkt. No. 42 ("MTD Order") at 9. Plaintiffs amended the complaint, realleging the EADACPA and UCL claims, and adding a new claim under Division 11 of the California Commercial Code. Dkt. No. 45 ("FAC") ¶¶ 239–330.

As before, Plaintiffs allege that they were victims of a fraudulent scheme in which unidentified third-party fraudsters took $18.5 million of their savings. *See id.* at ¶¶ 3, 9. Mr. Liu

United States District Court
Northern District of California

United States District Court
Northern District of California

initially spoke to a fraudster who posed as a Charles Schwab representative and told Plaintiffs that their investment accounts had been compromised and that they had to liquidate their stock and transfer their assets to "external sources" to safeguard them. *See id.* at 56–62. In the FAC, Plaintiffs repeatedly characterize the fraudster's conduct as "psychological coercion" and "psychological manipulation," and assert that Mr. Liu was in "a state of severe economic duress" as a result. *See id.* at ¶¶ 4–5, 31–39, 63, 130, 139, 153, 168, 242–47. Plaintiffs contend that Mr. Liu was "unable to exercise independent judgment" or think clearly due to the scammer's actions. *See id.* at ¶¶ 4–5, 153.

In this state, Mr. Liu granted the fraudster access to his home computer, and the scammer linked Plaintiffs' Charles Schwab account to several of Plaintiffs' other bank accounts, including one at Bank of America. *Id.* at ¶¶ 3, 62–68. The fraudster also convinced Mr. Liu that he had to open an account at a cryptocurrency exchange, Unchained Trading, LLC, to further protect Plaintiffs' assets. *Id* at ¶ 71. The Unchained account was created in Mr. Liu's name and seemingly belonged to him. *See id.* at ¶ 74. Plaintiffs contend, however, that "Mr. Liu had no dominion, control, or custody over the account." *Id.*

In July 2024, the fraudster transferred large sums from Plaintiffs' Charles Schwab account to Plaintiffs' Bank of America account. *See id.* at ¶¶ 83–85, 90, 97. Later that month, Mr. Liu went in person to a Bank of America branch to request a wire transfer to the Unchained account. *See id.* at ¶ 98. According to Plaintiffs, Mr. Liu specifically advised one of the bankers that he was having a security issue at Charles Schwab, requiring him to move his assets to a cryptocurrency exchange to protect them. *See id.* at ¶¶ 98, 101–02. Plaintiffs contend that "Mr. Liu exhibited visible distress, anxiousness, and confusion." *Id.* at ¶ 103. Nevertheless, Defendant processed the transfer as requested. *Id.* at ¶¶ 104–05.

Mr. Liu continued to visit Bank of America branches in person to request additional wire transfers. *See id.* at ¶¶ 109, 112, 121, 131, 140, 146, 152, 162, 167. Only once did a branch refuse to process the transfer. *See id.* at ¶¶ 7, 116–17. The representative told Mr. Liu that they were "'uncomfortable' with the transaction request." *Id.* at ¶ 117. However, another branch processed an identical transfer request the following day. *See id.* at ¶¶ 7, 120–23. Once the funds were in

the Unchained account, the scammers used the funds to purchase cryptocurrency and swiftly withdrew the cryptocurrency from the account. *See id.* at ¶¶ 3, 106–08, 126–27, 135–36. Between July and September 2024, Mr. Liu transferred approximately $22 million into and out of his Bank of America account before the Federal Bureau of Investigation intervened and provided notice of the fraudulent scheme to Plaintiffs, Charles Schwab, Bank of America, and Unchained. *See id.* at ¶¶ 171–79. Ultimately, Plaintiffs lost $18.5 million. *See id.* at ¶¶ 9, 234. Plaintiffs urge that Mr. Liu's banking transactions were unusual, and Bank of America should have been aware of—and stopped—the fraudulent scheme. *See id.* at ¶¶ 7–9, 52, 69, 94, 99–100, 133.

Defendant again moves to dismiss. Dkt. No. 46 ("Mot.").

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 9(b) imposes a heightened pleading standard where fraud is an essential element of a claim. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003). A plaintiff must identify "the who, what, when, where, and how" of the alleged conduct, so as to provide defendants with sufficient information to defend against the charge. *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. Rule 9(b).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031. Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

## III. DISCUSSION

### A. California Uniform Commercial Code: Division 11

Unlike in the original complaint, Plaintiffs now bring a claim directly under Division 11 of the California Commercial Code.[1] They seek a refund of all the wire transfers from their Bank of America account to the Unchained account under § 11204. *See* FAC ¶¶ 239–62. Section 11204 states in relevant part:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) *not authorized* and not effective as the order of the customer under Section 11202 . . . the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

Cal. Com. Code § 11204(b)(i) (emphasis added). Under the statute, "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency." Cal. Com. Code § 11202(a).

#### i. Meaning of "Authorized" Under Division 11

Here, the parties dispute whether Plaintiffs have sufficiently alleged that the transfers were "not authorized" within the meaning of the statute. There is no dispute that Mr. Liu explicitly requested Defendant to initiate the wire transfers. *See id.* at ¶¶ 98, 109, 112, 121, 131, 140, 146,

[1] In 1990, the California Legislature enacted Article 4A of the Uniform Commercial Code ("UCC") as Division 11 of the California Uniform Commercial Code. *See Zengen, Inc. v. Comerica Bank*, 41 Cal. 4th 239, 244 (Cal. 2007).

152, 162, 167. Plaintiffs nevertheless contend that Mr. Liu did not authorize the transfers within the meaning of the statute because he was being coerced and was under "economic duress" by the fraudsters at the time he requested them. Dkt. No. 50 ("Opp.") at 10–11.

Defendant looks to the text of § 11202(a), and urges that the meaning of "authorized" depends on the identity of the sender. *See* Mot. at 7–8; *see also* Dkt. No. 51 ("Reply") at 2. On its face, the statute creates two scenarios by which a payment order (such as a wire transfer) may be authorized. Under the first, a payment order is authorized "if the person identified as sender authorized the order" himself. Cal. Com. Code § 11202(a). Under the second, a payment order is authorized "if the person identified as sender . . . is otherwise bound by [the order] under the law of agency." *Id.* In this way, a payment order may still be "authorized" even if the person who expressly requested it is just the agent of the sender. Although the statute is somewhat circular, under either scenario, the statute explicitly looks at *who* requested the payment order, not *why* he or she requested it. *See id.*; *see also* Mot. at 7. This is also consistent with the plain meaning of the term "authorized," which considers whether an act was "sanctioned by [someone with] authority" or was "done with legal or official approval."[2] Here, there is no dispute that Mr. Liu had the authority to request wire transfers out of his Bank of America account and that he provided his approval for the transfers.

Courts have found transactions "authorized" under similar circumstances for purposes of Division 11 and the UCC equivalent under Article 4A. In *Wellton International Express v. Bank of China (Hong Kong)*, for example, Wellton International received an email purportedly from a business partner, Wellton Express, requesting approximately $150,000 for services rendered. 612 F. Supp. 3d 358, 361 (S.D.N.Y. 2020). Unbeknownst to Wellton International at the time, the email was in fact sent from a computer hacker. *Id.* Wellton International wired the payment from its Bank of China account to a Wells Fargo bank account identified in the fraudulent email. *Id.* After learning the email was fraudulent, Wellton International notified Bank of China, JP Morgan (an intermediary to the transfer), and Wells Fargo not to transfer the funds. *Id.* at 361–62. But the

---

[2] *See Authorized*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/authorized (last visited August 3, 2026).

United States District Court
Northern District of California

money was still transferred to Wells Fargo despite these warnings, and the fraudsters withdrew the funds. *Id.* In finding that the plaintiffs had failed to state a claim under Article 4A, the court explained that "the transfer was unequivocally authorized" because the plaintiffs "explicitly allege in the complaint that Wellton International sent the wire transfer." *Id.* at 364. It was irrelevant that the plaintiffs may have authorized the transfer erroneously or based on third-party misrepresentations. *See id.* at 364–65.

Similarly, in *Harborview Cap. Partners, LLC v. Cross River Bank*, a third-party fraudster hacked the email account of the plaintiff's CEO, and instructed the company's accounting manager to make wire transfers to a foreign account. 600 F. Supp. 3d 485, 486–87 (D.N.J. 2022). In dismissing the plaintiff's UCC claim, the court explicitly stated that "the transfers were not 'unauthorized'" because "they were specifically ordered by [the company's] Account Manager." *Id.* at 491. The court further explained that the account manager "was indisputably authorized . . . to sign and send the Wire Transfer Forms." *Id.* at 493. The court noted that the UCC specifically allocates risk, and "[t]he customer who, sadly, has been the victim of a third-party fraud cannot shift the loss to a bank that faithfully executed the customer's instructions to implement a transfer." *Id.* at 494–96.

As a corollary, courts have found transfers unauthorized for purposes of Division 11 where the fraudster—rather than the customer—initiates the transfer. In *Jung v. Discover Bank*, the plaintiff's wife received a call from a fraudster impersonating their bank's fraud team. *See* 822 F. Supp. 3d 1098, 1100–01 (N.D. Cal. 2026). Following the fraudster's instructions, the wife received authentication codes that appeared to be from the bank and verified her identity using a third-party vendor. *Id.* The plaintiff was then notified that a $110,000 wire transfer was initiated from his bank account. *Id.* at 1101. At least as alleged, the wife "did not think that she was authorizing a wire transfer" when she confirmed her identity, and neither the plaintiff nor his wife knew about the wire transfer at the time it was requested. *Id.* at 1103. The court found these allegations sufficient at the motion to dismiss stage to plead that the wire transfer was unauthorized, and thus denied the motion to dismiss the Division 11 claim. *Id.* Whether finding a transfer authorized or unauthorized, courts have thus looked to the identity and apparent authority

United States District Court
Northern District of California

of the person requesting the transfer.

Plaintiffs nevertheless contend that even if an account holder like Mr. Liu explicitly requests a payment order, that is still not enough to establish that the request was "authorized." Rather, Plaintiffs argue that the meaning of "authorized" under § 11202 incorporates considerations of "voluntary consent." Opp. at 10. Accordingly, under Plaintiffs' interpretation, whether payment orders are "authorized" depends on "whether they were the product of [the sender's] free will." *See id.* Plaintiffs thus would require banks (and courts) to consider a sender's mental state at the time of any transfer.

The statute says nothing on its face about "voluntary consent" or "free will." Instead, in support of this reading, Plaintiffs seek to import "doctrines of contract law" into Division 11, including the common law defense of "economic duress." *See id.* at 9–10; *see also* FAC ¶¶ 5, 38, 242–62. Plaintiffs point to a general provision under California Commercial Code § 1103(b), which states:

> Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, *duress*, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions.

Cal. Com. Code § 1103(b) (emphasis added). Based on this language, Plaintiffs conclude that "duress negates authorization" under Division 11. *See* Opp. at 10. In short, Plaintiffs argue that Mr. Liu was under severe pressure at the time he requested the wire transfers because the fraudster had told him that he was at risk of losing his assets. *See* Opp. at 11–12. Such third-party "duress," Plaintiffs urge, means—despite his explicit conduct and authority—that Mr. Liu did not authorize the wire transfers. The Court is not persuaded.

Even by its terms, § 1103(b) can only apply "[u]nless displaced by the particular provisions of this code." As Defendant points out, however, importing "economic duress" into Division 11 in the way Plaintiffs suggest here would upend the statute and its stated goals. Under Plaintiffs' interpretation, banks could never predict whether a requested transfer was in fact "authorized" or whether it was instead the product of third-party interference. Plaintiffs'

interpretation would mean that authorization could always be contested after the fact. But the California Supreme Court has recognized that Division 11 "provide[s] a detailed scheme for analyzing the rights, duties and liabilities of banks and their customers in connection with the authorization and verification of payment orders." *Zengen*, 41 Cal. 4th at 251–52. Certainty and the ability to predict risk were paramount considerations under the statute. This is underscored by the comment to UCC § 4A-102, which California adopted as § 11102:

> A deliberate decision was [] made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, *a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty*, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

Cal. Com. Code § 11102 (U.C.C. § 4A-102, Article 4A cmt. (2022)) (emphasis added).[3] The commentary also directly explains that "resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." *Id.*

Plaintiffs' only cited case is inapposite. In *Rich & Whillock, Inc. v. Ashton Development, Inc.*, the parties signed a contract for grading and excavating services, and later agreed that the plaintiff would remove a rock on the project site for an additional cost. 157 Cal. App. 3d 1154, 1156 (Ct. App. 1984). After completing the project, the defendant refused to pay the full amount of the additional rock removal. *Id.* at 1156–57. The defendant offered a reduced "final compromise payment," and told the plaintiffs "this is all you get." *Id.* at 1157. The plaintiffs accepted the reduced payment in exchange for a release of their claims, but said that they only did so because they needed the money to stay afloat as a new company. *See id.* The California Court of Appeal affirmed a judgment that found the settlement and release "were the products of

[3] The California Supreme Court has stated that the Code Comments are "persuasive in interpreting the statute." *Zengen*, 41 Cal. 4th at 252.

United States District Court
Northern District of California

economic duress." *Id.* at 1156, 1160. Even assuming Mr. Liu experienced economic duress at the hands of third-party fraudsters, *see* FAC ¶ 249, the case says nothing about whether economic duress can be used to "negate authorization" and shift liability to the banks in the context of Division 11.

Without question, Plaintiffs were the victims of fraud, and the Court does not minimize the grave ramifications of that crime. But the Court finds that applying the common law defense of economic duress here to negate Mr. Liu's explicit authorization for the wire transfers is inconsistent with—and thus displaced by—Division 11. Accordingly, as alleged, Plaintiffs cannot state a claim for relief under Division 11 because the wire transfers were "authorized" under the meaning of the statute.

**B. Displacement of Remaining Claims**

The Court previously held that Plaintiffs' remaining claims were displaced by Division 11. *See* MTD Order at 4–9. As discussed in the prior order, the California Supreme Court has held that given its detailed regulatory structure, Division 11 displaces or "preempts" common law causes of action involving funds transfers in two specific circumstances:

> (1) where the common law claims would create rights, duties, or liabilities inconsistent with division 11; and (2) where the circumstances giving rise to the common law claims are specifically covered by the provisions of division 11.

*Zengen*, 41 Cal. 4th at 253 (quotation omitted). Few cases have addressed whether statutory claims are likewise displaced. Still, the Court held that the reasoning in *Zengen* applied equally to statutory claims, and thus found that Plaintiffs' claims were displaced. *See* MTD Order at 7–8.

Defendant again requests that the Court find Plaintiffs' EADACPA and UCL claims displaced by Division 11. *See* Mot. at 13. In response, Plaintiffs urge that they are "not seek[ing] a Division 11 refund for an 'unauthorized' transfer" as part of their EADACPA and UCL claims, despite referencing the same $18.5 million. *See* Opp. at 13; *see also* FAC at 61 ("Prayer for Relief"). Instead, they suggest that that they are seeking relief under distinct legal theories for "independent misconduct—knowingly facilitating a scam, violating federal compliance duties

designed to prevent financial crime, and breaching anti-money-laundering obligations." *See* Opp. at 13. Plaintiffs also generically conclude that Division 11 "would not immunize the Bank from liability for violating independent statutory duties while processing those wires." *See id.* at 14.

Critically, however, Plaintiffs do not engage at all with the Court's prior reasoning or the two-part test in *Zengen*. Despite Plaintiffs' suggestion otherwise, the Court does not believe Division 11's scope is "unlimited" or would "shield banks from liability for violating civil or criminal statutes, which are independent regimes addressing distinct conduct." *See id.* at 13. Rather, as previously discussed, Plaintiffs' EADACPA and UCL claims do not appear "distinct" from their Division 11 claim, and instead appear to "create rights, duties, or liabilities inconsistent with "[D]ivision 11." *Zengen*, 41 Cal. 4th at 253.

Notwithstanding the labels that Plaintiffs put on their remaining claims, their "gravamen" is that Defendant should not have accepted and executed Mr. Liu's wire transfers, and therefore must refund them the $18.5 million. *See Zengen*, 41 Cal. 4th at 254. This is highlighted by Plaintiffs' opposition brief, in which they state that Defendant can still be liable for processing "authorized" payment orders while "remain[ing] willfully blind to the customer's victimization" under separate statutes. *See* Opp. at 14. Rather than identifying separate conduct that is independent from or unrelated to the bank's rights, duties, or liabilities in processing payment orders under Division 11, Plaintiffs are searching for a legal theory to hold Defendant responsible by disregarding the "detailed scheme" Division 11 creates. *Zengen*, 41 Cal. 4th at 251–52.

Under their EADACPA claim, for example, Plaintiffs allege that "Defendant assisted in taking Plaintiffs' property when they completed eight wire transfers amounting to $22,000,000.00 in furtherance of an elder financial abuse scheme." *See* FAC ¶ 267. Notwithstanding Mr. Liu's authorization, as discussed above, Plaintiffs contend that Defendant should be liable for failing to detect and stop a third-party fraud scheme. *See id.* at ¶ 281 ("[T]he failure to report, prevent or delay the suspicious transfers of tens of millions of dollars from Plaintiffs' BofA account over only a handful of weeks, and in some cases within a matter of days, constituted assisting in the taking of funds from Plaintiffs for a wrongful purpose, with the intent to defraud, and/or undue influence.").

Likewise, under their UCL claim, Plaintiffs allege that Defendant was "willfully blind to an elder financial exploitation scam happening in its financial system" and "provided federally regulated banking services to the scammers anyway." *See* FAC ¶ 291. The "banking services" that Defendant provided were the wire transfers themselves: Defendant failed to protect Plaintiffs by "transferring millions of dollars of Plaintiffs' funds via wire transfers" and "fail[ing] to monitor and investigate large, atypical and suspicious transactions." *Id.* at ¶¶ 292, 314. Again, Plaintiffs seek to sidestep Mr. Liu's authorization for the wire transfers by couching the same conduct—processing the wire transfers—as a UCL claim.

In the FAC, Plaintiffs also add a UCL claim premised on "violations of the Bank Secrecy Act" ("BSA"). *See id.* at ¶¶ 294–330. Plaintiffs allege that the BSA requires Defendant "to implement and maintain an effective anti-money laundering (AML) program reasonably designed to prevent its financial system from being used to facilitate money laundering." *See id.* at ¶ 294 (citing 31 U.S.C. § 5318(h) and 31 C.F.R. Chapter X). Plaintiffs also allege that Defendant's BSA compliance programs were deficient. *See, e.g.*, *id.* at ¶¶ 202–19. The FAC discusses in detail that in December 2024 Defendant "consented to the issuance of an Office of the Comptroller of Currency ('OCC') Consent Order in lieu of prosecution, acknowledging that the bank had failed to comply with the BSA and implementing regulations." *Id.* at ¶ 202.

Here too, however, Plaintiffs' UCL claim still seeks to hold Defendant responsible for processing Mr. Liu's requested wire transfers. Plaintiffs allege that Defendant's failure "to meet its BSA compliance obligations . . . directly and proximately caused Plaintiffs to lose their life's savings." *Id.* at ¶ 52; *see also id.* at ¶ 302 ("Defendant failed to detect and/or prevent their financial systems from being used to facilitate the money laundering and elder financial exploitation that occurred in this case."); *id.* at ¶ 324 ("But for Defendant's BSA and AML violations, the harms and money laundering that occurred in this case would never have happened."). Plaintiffs' reference to the BSA does not alter the gravamen of the claim (and all Plaintiffs' claims): Defendant should not have processed the transfers and "Plaintiffs have a right to an order requiring Defendant to restore Plaintiffs' money and interest . . . ." *See id.* at ¶ 328.

Plaintiffs are correct that "Division 11's scope is not unlimited." *See* Opp. at 13. But they

do not persuasively explain why its scope should not apply to their claims as alleged here, which all seek to challenge and refund the wire transfers that Mr. Liu admittedly requested.

But in any event, even if the Court were to find that Plaintiffs' statutory claims were not displaced by Division 11, Plaintiffs still have failed to allege a plausible claim for relief.

**C. EADACPA**

As before, Plaintiffs allege that Defendant's conduct "assisted" the scammer in taking millions of dollars of Plaintiffs' savings, in violation of the EADACPA, by processing the wire transfers from Plaintiffs' Bank of America accounts to the Unchained account. *See* FAC at ¶¶ 263–88. Section 15610.30(a) states that "financial abuse of an elder" occurs when a person or entity "[a]ssists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both." Cal. Welf. & Inst. Code § 15610.30(a)(2). Courts have interpreted the term "assist" in this context to require that the defendant had "actual knowledge of the underlying wrong it purportedly aided and abetted." *See, e.g.*, *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 744–45 (Cal. Ct. App. 2010) (quotation omitted).

In dismissing the original elder abuse claim, the Court found that Plaintiffs had failed to allege that Defendant had actual knowledge of the fraud. *See* MTD Order at 9. At bottom, Plaintiffs' allegations remain largely the same. Plaintiffs allege that (1) Mr. Liu told bankers about a security issue with his Charles Schwab account; (2) his banking activity was unusual; (3) he was transferring large sums into a cryptocurrency account bearing his own name; and (4) one branch previously declined to process a wire transfer, stating "they were 'uncomfortable' with the transaction request." *See* FAC at ¶ 117. In the FAC Plaintiffs attempt to buttress these allegations by asserting:

- At times "Mr. Liu exhibited visible distress, anxiousness, and confusion," *id.* at ¶¶ 103, 114; and
- The OCC Consent Order challenged the sufficiency of the bank's policies and procedures for identifying and reporting suspicious activity, including at the time of

> the transactions at issue here, and directed the bank to take comprehensive remedial measures. *See id.* at ¶¶ 202–31.

But these allegations still clearly fall short. Even assuming Defendant had limited resources, training, or policies in place to detect suspicious activity, such limitations actually undermine Plaintiffs' suggestion that the bank had actual knowledge of the third-party fraud. In any event, as previously explained, Mr. Liu was requesting to transfer money from his own Bank of America account to an Unchained account bearing his own name. "There are no allegations supporting the inference that [Bank of America] knew a third party had access to Mr. Liu's Unchained account such that his money was unsafe there or that these transfers were part of some larger fraud scheme." MTD Order at 10. Plaintiffs' conclusory assertions to the contrary are not sufficient.

In the alternative, Plaintiffs urge that Defendant was "willfully blind" to the existence of the fraudulent scheme. *See* FAC at ¶¶ 220–31, 273–78. To allege willful blindness, "(1) [t]he defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). This argument also fails.

Plaintiffs urge that Defendant subjectively believed there was a high probability of fraud, emphasizing that a single teller at a single branch on a single day declined to process one of the transactions. Plaintiffs argue that "[t]his decision can only be explained because the Bank *knew* Mr. Liu was a victim of fraud . . . ." Opp. at 18 (emphasis in original). But despite Plaintiffs' suggestion otherwise, the FAC does not allege that the representative identified any fraud. Plaintiffs' argument collapses into circular reasoning: Defendant subjectively believed there was a high probability Mr. Liu was the victim of fraud because Defendant should have known that he was the victim of fraud. "At best, [Plaintiffs' allegations] suggest that Defendant should have had suspicions that Mr. Liu was a possible fraud victim," MTD Order at 9, and this is not enough.

**D. UCL**

Plaintiffs once again contend that Defendants' conduct was unlawful, unfair, and fraudulent under the UCL. *See* FAC at ¶¶ 289–330.

**i. Equitable Relief**

"In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus.*, 49 F.4th 1308, 1313 (9th Cir. 2022). The Court previously found that Plaintiffs had failed to plead that they lacked an adequate legal remedy, noting however that this would be "easy to remedy." *See* MTD Order at 13. Despite how "easy" it might have been, however, Plaintiffs still have not done so. Instead, they attempt to sidestep this in their opposition brief by arguing that they (1) are pleading "in the alternative" to the extent they seek a return of the transferred funds, and (2) are seeking "public injunctive relief" in the form of policy changes to prevent future harm. *See* Opp. at 21–22.

Plaintiffs may plead in the alternative, but that does not absolve them of the requirement to plead the inadequacy of a legal remedy. And to the extent Plaintiffs seek prospective "public injunctive relief," they have not established that they have Article III standing to do so. To have standing to seek prospective injunctive relief, a plaintiff must "demonstrate a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (quotation omitted); *cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."). Plaintiffs have not alleged how they are at risk of a repeated injury based on Bank of America's internal protocols for identifying possible elder abuse and fraud.

**ii. Substantive Claim**

Setting aside these procedural deficiencies, Plaintiffs' substantive claim remains deficient. The UCL "borrows violations from other laws by making them independently actionable as unfair competitive practices. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). Here, Plaintiffs' UCL claim fails to the extent it is premised on the Elder Abuse Law, for the same reasons discussed in Section III.C. above. The claim also fails to the extent it is premised on violations of the BSA. *See* FAC at ¶¶ 294–330. Plaintiffs allege that "[b]ut for Defendant's BSA and AML violations, the harms and money laundering that occurred in this case

United States District Court
Northern District of California

would never have happened." *See id.* at ¶ 324. However, they do not provide allegations to support this inference, and there appears to be a disconnect between the alleged BSA violations and the harm Plaintiffs suffered here. Although Plaintiffs detail various monitoring and reporting obligations under the BSA, Plaintiffs have not identified any obligation Defendant would have had to stop the transactions at issue in this case, even if they had flagged them as suspicious. Plaintiffs allege that "[t]he standard in the banking industry is to [] stop the suspicious transactions and close accounts that have suspicious activity to prevent money laundering or other financial fraud from continuing." *See* FAC at ¶ 191. But Plaintiffs do not allege in the complaint, or explain in their opposition brief, that this "standard" in the industry is a legal requirement. Plaintiffs seek to hold Defendant responsible for a third-party fraud scheme. But the Court finds that the added allegations are still insufficient to do so.

## IV. CONCLUSION

The Court **GRANTS** the motion to dismiss. Dkt. No. 46. Plaintiffs have had ample opportunity to amend the complaint and have failed to cure the deficiencies that the Court previously identified. The Court therefore **DISMISSES** the case against Defendant without leave to amend. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("Leave to amend should be granted unless the pleading could not possibly be cured by the allegation of other facts, and should be granted more liberally to pro se plaintiffs.") (quotations omitted); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009) ("[W]here the Plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad." (quotation omitted)). The Clerk is directed to enter judgment in favor of Defendant and against Plaintiffs, and to close the case.

**IT IS SO ORDERED.**

Dated: 8/5/2026

Haywood S. Gilliam, Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge